No. 25-40497

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

WALTER LEE HOUZE,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

---

# BRIEF FOR APPELLANT

---

PHILIP G. GALLAGHER
Federal Public Defender
Southern District of Texas

KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

**CERTIFICATE OF INTERESTED PERSONS**
United States v. Walter Lee Houze,
No. 25-40497

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

1. The Honorable Drew B. Tipton, United States District Judge.
2. The Honorable Juan F. Alaniz, United States Magistrate Judge.
3. Walter Lee Houze, Defendant-Appellant.
4. United States of America, Plaintiff-Appellee.
5. Counsel for Plaintiff-Appellee: United States Attorney Nicholas J. Ganjei; former United States Attorney Alamdar S. Hamdani; and Assistant United States Attorneys Alexa D. Parcell and Carmen Castillo Mitchell.
6. Counsel for Defendant-Appellant: Federal Public Defender Philip G. Gallagher; former Federal Public Defender Marjorie A. Meyers; and Assistant Federal Public Defenders Chris Gonzalez, Evan G. Howze, and Kathryn Shephard.

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kathryn Shephard
KATHRYN SHEPHARD

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant Walter Lee Houze requests oral argument. This appeal raises a significant issue about whether the district court erred by denying Mr. Houze's motion to suppress evidence. Counsel therefore believes that oral argument would be beneficial to the Court.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

REQUEST FOR ORAL ARGUMENT .................................................................... ii

TABLE OF CONTENTS ................................................................................... iii

TABLE OF CITATIONS ......................................................................................v

STATEMENT OF JURISDICTION .......................................................................1

STATEMENT OF THE ISSUE ...............................................................................2

STATEMENT OF THE CASE ................................................................................3

A. Indictment ...........................................................................................3

B. Motion to suppress evidence and suppression hearing ..........................3

1. A drug investigation led to a traffic stop where the K-9 did not alert .........................................................................................4

2. In the primary inspection area of the immigration checkpoint, the K-9 did not alert and Border Patrol had no immigration concerns ..........................................................................................10

3. In the secondary inspection area, Mr. Houze revoked his consent to search ..........................................................................13

4. Post-hearing litigation and the district court's rulings ..................16

C. Conditional guilty plea, sentencing, and appeal ..................................17

SUMMARY OF THE ARGUMENT ....................................................................19

ARGUMENT .....................................................................................................20

## TABLE OF CONTENTS – (cont'd)

**Page**

**ISSUE RESTATED**: The district court reversibly erred by denying Mr. Houze's motion to suppress evidence ....................20

A. Standard of review....................20

B. Legal framework ....................20

C. Mr. Houze's detention at the primary inspection area of the immigration checkpoint was unlawful ....................24

D. Mr. Houze's consent to search did not dissipate the taint of the Fourth Amendment violation ....................32

E. Alternatively, Mr. Houze's continued detention in secondary after he revoked his consent was unlawful ....................34

CONCLUSION....................37

CERTIFICATE OF SERVICE ....................38

CERTIFICATE OF COMPLIANCE....................39

## TABLE OF CITATIONS

**Page**

## CASES

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) ......................22, 25, 27-28, 33

*Florida v. Royer*, 460 U.S. 491 (1983) ............................................................22-23

*Heien v. North Carolina*, 574 U.S. 54 (2014)........................................................ 31

*Illinois v. Caballes*, 543 U.S. 405 (2005) ............................................................. 23

*INS v. Delgado*, 466 U.S. 210 (1984) .................................................................... 31

*Kansas v. Glover*, 589 U.S. 376 (2020) ................................................................. 31

*Michigan v. Chesternut*, 486 U.S. 567 (1988) ....................................................... 31

*Muehler v. Mena*, 544 U.S. 93 (2005) ................................................................... 30

*Navarette v. California*, 572 U.S. 393 (2014) ....................................................... 31

*Rodriguez v. United States*, 575 U.S. 348 (2015) ................................22-23, 31, 34

*Terry v. Ohio*, 392 U.S. 1 (1968) ........................................................................... 22

*United States v. Alvarez*, 40 F.4th 339
(5th Cir. 2022)........................................................................................................ 20

*United States v. Ansourian*, 487 Fed. Appx. 155
(5th Cir. 2012) (unpublished) ............................................................................. 33

*United States v. Brigham*, 382 F.3d 500
(5th Cir. 2004)........................................................................................................ 35

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)......................................... 21

*United States v. Castille*, 478 Fed. Appx. 868
(5th Cir. 2012) (unpublished) ..........................................................................29-30

**TABLE OF CITATIONS – (cont'd)**

**Page**

**CASES – (cont'd)**

*United States v. Conlenzo-Huffman*, 292 Fed. Appx. 361
(5th Cir. 2008) (unpublished) .......... 20

*United States v. Dortch*, 199 F.3d 193
(5th Cir. 1999), *opinion corrected on denial of reh'g*,
203 F.3d 883 (5th Cir. 2000) .......... 34-36

*United States v. Grant*, 349 F.3d 192
(5th Cir. 2003) .......... 28

*United States v. Ho*, 94 F.3d 932
(5th Cir. 1996) .......... 35

*United States v. Jackson*, 328 Fed. Appx. 933
(5th Cir. 2009) (unpublished) .......... 29

*United States v. Jaime*, 473 F.3d 178
(5th Cir. 2006) .......... 21, 25, 29

*United States v. Jaquez*, 421 F.3d 338
(5th Cir. 2005) .......... 20

*United States v. Jenson*, 462 F.3d 399
(5th Cir. 2006) .......... 32-33, 35

*United States v. Jones*, 234 F.3d 234
(5th Cir. 2000) .......... 36

*United States v. Machuca-Barrera*, 261 F.3d 425
(5th Cir. 2001) .......... 21, 23, 25, 31, 34

*United States v. Macias*, 658 F.3d 509
(5th Cir. 2011) .......... 20, 32-33, 35

## TABLE OF CITATIONS – (cont'd)

**Page**

## CASES – (cont'd)

*United States v. Martinez*, 486 F.3d 855 (5th Cir. 2007) ........ 33

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) ........ 21-22, 27

*United States v. Monsivais*, 848 F.3d 353 (5th Cir. 2017) ........ 20

*United States v. Portillo-Aguirre*, 311 F.3d 647 (5th Cir. 2002) ........ *passim*

*United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002) ........ 33

*United States v. Sharpe*, 470 U.S. 675 (1985) ........ 23

*United States v. Wright*, 57 F.4th 524 (5th Cir. 2023) ........ 20

## STATUTES AND RULES

18 U.S.C. § 2 ........ 3

21 U.S.C. § 841(a)(1) ........ 3

21 U.S.C. § 841(b)(1)(A) ........ 3

21 U.S.C. § 841(b)(1)(A)(ii) ........ 17

21 U.S.C. § 846 ........ 3

28 U.S.C. § 1291 ........ 1

Fed. R. App. P. 4(b)(1)(A)(i) ........ 1

## TABLE OF CITATIONS – (cont'd)

**Page**

## STATUTES AND RULES – (cont'd)

Fed. R. App. P. 4(b)(2) ........ 1

Rule 28.2.1 ........ i

## STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked under 28 U.S.C. § 1291, as an appeal from a final judgment in the United States District Court for the Southern District of Texas.

The judgment appealed from was entered on the docket on August 14, 2025. Mr. Houze timely filed notice of appeal on August 13, 2025, after the announcement of judgment and sentence on August 12, 2025. *See* Fed. R. App. P. 4(b)(1)(A)(i), (b)(2).

## STATEMENT OF THE ISSUE

Whether the district court reversibly erred by denying Mr. Houze's motion to suppress evidence.

## STATEMENT OF THE CASE

### A. Indictment.

On May 30, 2023, a federal grand jury in the United States District Court for the Southern District of Texas, McAllen Division, returned a two-count indictment charging defendant-appellant Walter Lee Houze and co-defendant Jose Taurus Burks with, on or about May 9, 2023, (1) conspiring to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); and (2) possessing with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. ROA.29-30. Count Two charged that the controlled substance involved was 5 kilograms or more, that is, approximately 14.26 kilograms, of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance. ROA.30.

### B. Motion to suppress evidence and suppression hearing.

On November 27, 2023, Mr. Houze filed a motion to suppress evidence. ECF No. 42.[1] The government filed a response in opposition, ECF No. 45, and Mr. Houze filed a reply. ECF No. 48.

At the suppression hearing on January 30, 2024, the government called four witnesses: HSI Special Agent Mathew Orzechowski (ROA.138-185), DEA Agent

[1] This brief will cite several documents originally filed under seal in the district court by reference to their district court ECF document numbers. The documents provided by the clerk's office do not have EROA pagination. On January 28, 2026, the district court entered an order granting the parties' joint motion to unseal Dkt. Nos. 42, 48, 54, 55, 75, 77, 82, 88, and 110.

Domingo DeLeon (ROA.186-212), BP Agent Pablo Garza (ROA.213-255), and BP Agent Felipe Arroyo (ROA.258-289). The government submitted two exhibits: Government Exhibit 1 ("GX1"), a video from the body-worn camera of an identified agent at the secondary inspection area, ROA.268-271, and a second exhibit consisting of the 3-minute and 21-second video from Agent DeLeon's body-worn camera at the primary inspection area. ROA.134-135, 195.[2] Mr. Houze submitted one exhibit, a screenshot from a body-worn camera in the secondary inspection area showing five uniformed Border Patrol agents. ROA.241-243; ECF No. 52.

1. *A drug investigation led to a traffic stop where the K-9 did not alert.*

Agent Orzechowski testified about his drug investigation that led law enforcement to conduct a traffic stop of Mr. Houze at which the K-9 did not alert. In May 2023, Agent Orzechowski was working at Homeland Security Investigations as part of the Mid-Valley Task Force. ROA.141. The previous month, in April 2023, he had become aware of a possible narcotics purchase in Mission, Texas. ROA.141. A confidential source from whom he had "received credible information [in] the past" had identified two local people and an address in Mission, Texas, ("the house") where an upcoming narcotics transaction may occur. ROA.141. The two locals were

[2] Although the 3:21 video was played at the hearing, the government inadvertently submitted a disc containing a 1:16 video of the primary inspection area as Exhibit 2. On February 11, 2026, the district court entered an order granting the parties' joint motion to amend the government's exhibit list to add a USB containing the 3:21 video from primary as "Exhibit 3." ECF No. 184. This brief will refer to the 3:21 video as "GX3."

already known to law enforcement, which ran records checks on their cellular devices to find out who they had been in contact with. ROA.141. That investigation led to a phone number that came back to a Walter Houze. ROA.142-143. It was a Michigan phone number, which was significant because the source had said he did not know the name of the people purchasing the narcotics but had heard they were from out of state, and that it was about a two-day drive to get from wherever they were to Mission, Texas. ROA.141-142. It would take about two days to drive from Detroit, Michigan, to the Rio Grande Valley. ROA.143. Database searches yielded two Walter Houzes with different ages. ROA.143-144. Agent Orzechowski looked for vehicles registered to Walter Houze, and he discovered a GMC pick-up truck that license plate reader databases placed in Tennessee. ROA.144-145. The GMC was later located outside of Dallas and Alice, Texas. ROA.145. After it was located in Alice, Agent Orzechowski did not have any other information about that vehicle. ROA.145.

Before this case, the confidential source had provided Agent Orzechowski or his agency information on three or four separate cases. ROA.156. The source had never testified in federal or state criminal court before, was not a defendant in any pending case, and had never been prosecuted. ROA.156-157. The source provided the information directly to Agent Orzechowski, who did not record the exchange. ROA.157. The source did not indicate that the buyers were from Michigan; he

identified the local individuals involved and said that there should be two buyers coming in from out of state. ROA.158. The source did not provide a physical description of the potential buyer, did not provide a license plate number of the vehicle the potential buyer would be driving, and did not provide any description of the vehicle that the potential buyer would be driving. ROA.159-160. The source did not explain his basis for thinking there would be potentially buyers from out of state. ROA.160-161. The source had limited involvement in the narcotics transaction. ROA.161. When Agent Orzechowski initially talked to the source, the source did not specify when exactly the purchase would take place. ROA.161. Agent Orzechowski had no knowledge of any prior drug bust or narcotics transaction taking place at the house in Mission. ROA.161-162.

Beginning on May 2, 2023, law enforcement set up surveillance on the house in Mission for a few hours. ROA.145-146. They identified a vehicle whose registered owner was not a resident of the house. ROA.146. The person associated with that vehicle was local to the Rio Grande Valley. ROA.146. On May 3, 2023, they again surveilled the house. ROA.146. A resident left the house in their personal vehicle, and Agent Orzechowski decided to follow that vehicle until they reached their destination at a dealership. ROA.147. At the dealership, other agents saw a man exit the local resident's personal vehicle and reappear and enter a separate vehicle,

a silver Volkswagen Tiguan, a short time later. ROA.147. Both vehicles left the dealership and drove back to the house. ROA.147.

Law enforcement ran a records check on the Tiguan and learned it was registered to a Walter Houze out of San Antonio, Texas. ROA.148. Although the Tiguan was registered in Texas, Agent Orzechowski continued to investigate it because the GMC was also registered to a Walter Houze and the information from the source was that the people were from out of state, not necessarily the vehicle. ROA.148. When the Tiguan went from the dealership to the house, there was one person. ROA.149. Eventually, law enforcement identified a second person seen on multiple occasions in the Tiguan. ROA.149.

Law enforcement set up a 24-hour surveillance of the Tiguan, following it from the house back to a hotel. ROA.149. They saw the Tiguan at Club Carwash in Mission, during which the people associated with the Tiguan spent over an hour thoroughly cleaning the Tiguan's interior. ROA.150. More often than not, Mr. Houze was the driver of the Tiguan. ROA.150. Agent Orzechowski thought the cleaning of the Tiguan was suspicious because "it is a common tactic in narcotics smuggling where the drivers of the vehicle clean their vehicle to try to eliminate any scents, and also mask the scent of whatever may be in the vehicle with the -- the overpowering aroma of whatever cleaning products are used." ROA.164. After the carwash, the Tiguan returned to the house in Mission and remained there for some

time. ROA.165. At some point during the surveillance of the house, Agent Orzechowski saw an individual remove a black suitcase out of the rear of the Tiguan and take it into the house through the garage. ROA.152-153.[3]

On May 5, 2023, law enforcement conducted a traffic stop of the Tiguan between 10 pm and 11 pm. ROA.150. Agent Orzechowski was not there, but he learned that the two people in the Tiguan were from Michigan and their names were Walter Lee Houze, Jr., and Jose Taurus Burks. ROA.151. The fact that they were from out of state matched the information from the source. ROA.151.

Nothing came out of the traffic stop. ROA.152. When the Tiguan left the house at about 10 pm on May 5, Agent Orzechowski believed he had reasonable suspicion to stop the Tiguan for suspected involvement in narcotics activity. ROA.165-166. But law enforcement did not act on that suspicion; instead, the Tiguan was pulled over for a moving violation. ROA.167. Although not present at the stop, Agent Orzechowski learned through a group text chat that a K-9 sniffed for narcotics and did not alert. ROA.167-168. The K-9 “did a free air sniff of the exterior of the vehicle” and “no narcotics [were] detected.” ROA.183-184.

[3] Precisely when Agent Orzechowski made this observation is unclear. But it appears to have been before the traffic stop at which the K-9 did not alert. Agent Orzechowski clarified during cross-examination that, from the time of the May 5 traffic stop to the May 9 checkpoint stop, the only new information he had about Mr. Houze was the license plate reader notification on May 9 that the Tiguan was south of the Sarita checkpoint heading north. ROA.176-177.

When Agent Orzechowski learned that the K-9 did not alert, he texted in the group chat, "Cut them loose." ROA.168. By "cut them loose," he meant to let them go. ROA.168. Mr. Houze was released from the traffic stop, and Agent Orzechowski ended active surveillance of Mr. Houze. ROA.168. Law enforcement continued to surveil the house. ROA.169. At some point after the traffic stop, the Tiguan was seen again at the house, ROA.169-171, but Agent Orzechowski did not provide any details about when that happened or what, if anything, was observed beyond the Tiguan's presence at the house. After the traffic stop, Agent Orzechowski updated his internal case file with the names and the vehicle information. ROA.151-152. Law enforcement continued surveilling the house on a limited basis, and Agent Orzechowski monitored license plate readers. ROA.152.

On May 6, 2023, Agent Orzechowski created a "subject record," colloquially known as a BOLO, for the Tiguan as "believed to be involved in a narcotics transaction" in Mission, Texas, despite the fact that the Tiguan had come back negative for narcotics on May 5. ROA.153, 173-174, 176. The purposes of BOLOs are to track suspects and identify known versus unknown vehicles or people, and BOLOs can include notes for Customs, such as "send them for additional inspection." ROA.153. Reasonable suspicion is not required to enter a BOLO. ROA.173-174. Agent Orzechowski could enter it based on anything he deemed related to the case. ROA.174. There is no internal policy of limiting BOLOs to

people suspected of committing a crime. ROA.174. A BOLO can be entered on "individuals who are actually not involved." ROA.174. Once entered, a BOLO remains in the database "indefinitely." ROA.175.

Three days after Agent Orzechowski created the BOLO, he received a notification that the Tiguan had been observed on a license plate reader just south of the Border Patrol checkpoint in Sarita, Texas. ROA.153-154. Agent Orzechowski notified his supervisor, and between the two of them they notified the Kingsville Border Patrol station and the Sarita checkpoint itself that the Tiguan might be headed in that direction. ROA.154.

After a series of question about how local individuals and out-of-state suspects are treated differently, the prosecutor asked Agent Orzechowski "what is the importance of someone who's leaving the Rio Grande Valley from an [*sic*] out of state with a -- with a possible narcotics investigation?" ROA.182. He responded, "To determine whether or not they currently possess narcotics." ROA.183. The prosecutor then asked, "And the expectation in your training and experience that once they leave the Rio Grande Valley that the narcotics would then be in the vehicle?" ROA.183. He responded, "Yes." ROA.183.

2. *In the primary inspection area of the immigration checkpoint, the K-9 did not alert and Border Patrol had no immigration concerns.*

Agents Arroyo and DeLeon testified about their interactions with Mr. Houze in the primary inspection lane of the Sarita checkpoint on May 9, 2023. The Sarita

checkpoint is on Highway 77, which is one of the main routes by which illegal narcotics are trafficked into the United States. ROA.188-190.

Agent Arroyo and his K-9 were working in the primary area when Mr. Houze arrived. ROA.264-265. A few minutes before Mr. Houze's arrival, Agent Arroyo had been informed that there was a BOLO for a possible narcotics investigation. ROA.265. He looked down the line of cars and saw the Tiguan approaching. ROA.265. Agent Arroyo ran his K-9 from the driver's side headlight to the passenger's side taillight of the Tiguan, and the K-9 did not alert. ROA.265-266; GX3 2:04-2:10.

After testifying about how the checkpoint operates generally, ROA.190-194, Agent DeLeon testified that he saw a silver Volkswagen Tiguan approach the primary inspection area at about 8:15 am. ROA.194, 196. He "had received information that this vehicle may be associated with illicit activity, possibly narcotics." ROA.194. He also received an alert on the screen from the license plate reader system that alerts agents with red tags if there is "any kind of derogatory information." ROA.196-197.

Agent DeLeon's body-worn camera recorded his interaction with Mr. Houze. ROA.194-195, 199-200; GX3. It also captured his very brief interactions with the nine drivers preceding Mr. Houze. GX3 0:10-2:10. Agent DeLeon described

Mr. Houze's demeanor as "cordial," "cooperative," and "[a]greeable," and he had "nothing bad to say." ROA.201. Their conversation was as follows:

> **DeLeon**: Is it just the two of you today?
>
> **Houze**: Just the two of us—yup, yup.
>
> **DeLeon**: This your vehicle, sir?
>
> **Houze**: Yes, sir.
>
> **DeLeon**: You guys live in San Antonio? Is that a rental?
>
> **Houze**: No, this my car.
>
> **DeLeon**: Oh, just asking.
>
> **Houze**: Nuh-uh, no, this my car.
>
> **DeLeon**: Oh, okay. Sir, could we possibly take a look in your vehicle real quick?
>
> **Houze**: Oh, uh, I don't care.
>
> **DeLeon**: It's your prerogative, sir. We would j—just, it's just a screen, we would like to see if we could take a look at your vehicle real quick, sir. It will only take a few minutes and we'd appreciate it.
>
> **Houze**: Oh, I don't—you want me to pullover or something?
>
> **DeLeon**: Yeah, if you could. I mean, right in front of that pick-up truck would be great, I would appreciate it. They'll be right out, we'll get you down the road real quick. Alright?
>
> **Houze**: Okay.
>
> **Houze**: *unintelligible*

**DeLeon**: It happens occasionally, sir. I appreciate it. Thank you.

ECF No. 75 at 3; GX3 2:10 to 2:56.

Agent DeLeon had received information from his supervisor about the Tiguan's possible connection to illegal activity and that elevated his suspicion to investigate narcotics. ROA.205. Agent DeLeon never asked Mr. Houze whether he was a U.S. citizen. ROA.208. Agent DeLeon had no immigration-related concerns with the Tiguan at all from the time he saw Mr. Houze to the time Mr. Houze went to secondary. ROA.210. The only reason Mr. Houze was on Agent DeLeon's radar was the BOLO. ROA.210. While Agent DeLeon believed an agent could send someone to secondary at random, he had never done that. ROA.211. Agent DeLeon sent Mr. Houze to secondary because he consented to the search. ROA.211. If Mr. Houze had said no, there was nothing Agent DeLeon could have done, and he would have had to release him. ROA.211.

3. *In the secondary inspection area, Mr. Houze revoked his consent to search.*

Agents Garza and Arroyo testified about their interactions with Mr. Houze in the secondary inspection area. Mr. Houze's Tiguan was referred to secondary based on his consent to search. ROA.218-219. Agent Garza approached Mr. Houze and asked if there were any weapons in the vehicle, and Mr. Houze said he had a weapon on his waistband in the back. ROA.219-220. Agent Garza told Mr. Houze that he was sent to secondary for a consent to search, and Mr. Houze said that he did not

consent to a search. ROA.220. At that time, other agents were approaching the Tiguan, and so Agent Garza told them Mr. Houze did not consent to a search. ROA.220.

Agent Garza then asked Mr. Houze if Agent Garza could open the back hatch. ROA.220. Mr. Houze agreed to that and unlocked the hatch. ROA.220. Agent Garza walked to the back, opened up the back hatch, and saw a piece of hard-backed blue luggage and a piece of black luggage next to the back seat. ROA.220-221. Agent Garza asked if he could open the luggage, and Mr. Houze said no, he knew his rights, and the agent could not open it. ROA.222. But then Mr. Houze said Agent Garza could run a dog on it but did not consent to the agent opening the luggage. ROA.222. Agent Garza did not open the luggage. ROA.222. He called a K-9 over and said that Mr. Houze said the agents could run a dog on it. ROA.222.

As Agent Arroyo approached the secondary inspection area with his K-9, he saw that the Tiguan's back hatch was open. ROA.269; GX1. He took note of the agents already in the area and that Mr. Houze was still in the Tiguan; per the BOLO, Agent Arroyo was concerned that Mr. Houze was suspected to have a firearm on him. ROA.269. Unbeknownst to Agent Arroyo but shown on the body camera, the K-9 immediately stuck its head in the back cargo area. ROA.270; GX1. Agent Arroyo took his K-9 along the passenger side of the vehicle first and then around the front of the Tiguan. ROA.270-271. When they returned to the back cargo area, the

K-9 jumped into the Tiguan and alerted. ROA.271-274. Based on the alert, the Tiguan was searched, and about 14.26 kilograms of cocaine was found inside a black suitcase. ROA.273.

No video captured Agent Garza's interaction with Mr. Houze. ROA.223. Agent Garza was the only agent with Mr. Houze when he agreed to the trunk being opened, and Agent Garza was not wearing his body camera. ROA.223. Agent Garza had no basis to detain Mr. Houze in secondary for a second K-9 sniff or to open the trunk unless Mr. Houze consented. ROA.245-246. Had Mr. Houze said no, Agent Garza would have allowed Mr. Houze to proceed and leave the checkpoint. ROA.245-246.

In addition to his testimony at the suppression hearing, Agent Garza's affidavit described in more detail his interactions with Mr. Houze. ECF No. 77 at 8-10.[4] In relevant part, the affidavit stated:

> On May 9, 2023, I was working in my capacity as a United States Border Patrol Agent at the Border Patrol checkpoint near Sarita, Texas. At approximately 8:30 A.M., I received a call over the Service Radio from primary inspection regarding a vehicle being sent to secondary for a consent to search. At secondary inspection, I approached the driver, later identified as Walter Lee HOUZE, and asked if he had any weapons. HOUZE stated that he had a pistol located on the back side of his waist.

[4] This affidavit was originally filed with the government's response in opposition to Mr. Houze's motion to suppress evidence. ECF No. 45-3. At the October 22, 2024, hearing on Mr. Houze's motion to reconsider the suppression ruling and reopen the suppression evidence, the district court agreed to consider this affidavit. ROA.371.

> I advised HOUZE that he was sent to secondary because he had consented to a search of the vehicle at primary inspection. HOUZE stated, "I did not consent to a search". I asked HOUZE if I could open the back hatch of the vehicle to which HOUZE stated that I could look and unlocked the back hatch. After opening the hatch, I noticed that there were two pieces of luggage. I asked HOUZE if I could open the luggage to which HOUZE stated that I could not open the luggage. I asked HOUZE what he had inside the luggage to which HOUZE stated that he just had clothes. I inquired to HOUZE if he only had clothes inside the luggage, why couldn't I look inside. HOUZE stated that he knew his rights and stated, "You can run a dog on it, but I don't consent to you opening it".

ECF No. 77 at 9-10.

4. *Post-hearing litigation and the district court's rulings.*

The parties filed post-hearing briefs. ECF No. 54 (Mr. Houze); ECF No. 55 (the government). On September 6, 2024, the district court entered its memorandum opinion and order denying Mr. Houze's motion to suppress evidence. ECF No. 75. The court found that the initial detention was lawful and consent was legally obtained. ECF No. 75 at 7-9. The court further found that, although Mr. Houze "withdrew his consent to search his vehicle" when he arrived at secondary, the secondary inspection was lawfully executed. ECF No. 75 at 9-11.

On September 9, 2024, Mr. Houze filed a motion to reconsider the suppression ruling and reopen the suppression evidence. ECF No. 77. The government filed a response in opposition. ECF No. 82. On October 22, 2024, the court held a hearing on that motion, agreed to look at the issues again, and offered the parties an

opportunity to file additional briefs. ROA.374-374. On October 28, 2024, Mr. Houze filed a brief. ECF No. 88. The government declined to do so.

On February 24, 2025, the district court entered a memorandum opinion and order again denying Mr. Houze's motion to suppress evidence. ECF No. 110. In particular, the court rejected Mr. Houze's argument that Agent Garza "unlawfully prolonged the stop by requesting to open the Tiguan's back hatch without justification." ECF No. 110 at 9-13.

**C. Conditional guilty plea, sentencing, and appeal.**

On March 31, 2025, Mr. Houze conditionally pleaded guilty to Count Two of the indictment. ROA.380, 402. In his plea agreement with the government, Mr. Houze agreed to waive his right to appeal except for a claim of ineffective assistance of counsel and the adverse rulings on his motion to suppress. ROA.380, 384-385, 389-392; *see also* ROA.71-81 (plea agreement).[5]

At sentencing on August 12, 2025, the district court overruled Mr. Houze's objections to the presentence report and calculated the United States Sentencing Guidelines range as 97 to 121 months. ROA.438-439. But with the statutory mandatory minimum under 21 U.S.C. § 841(b)(1)(A)(ii), the bottom of the range increased to 120 months. ROA.439. The court imposed a sentence of 120 months in

[5] The plea agreement has typographical errors for some of the district court ECF document numbers, but the parties clearly intended that Mr. Houze preserve his right to appeal the adverse rulings on his motion to suppress. *See* ROA.391-392.

the custody of the Bureau of Prisons, to be followed by a five-year term of supervised release. ROA.441. The court waived imposition of a fine but imposed the $100 special assessment. ROA.441. The court granted the government's motion to dismiss the remaining count of the indictment. ROA.442.

On August 13, 2025, Mr. Houze timely filed notice of appeal. ROA.89-90; *see also* ROA.91 (judgment entered August 14, 2025). On appeal, he argues that the district court reversibly erred by denying his motion to suppress evidence.

## SUMMARY OF THE ARGUMENT

The district court reversibly erred by denying Mr. Houze's motion to suppress evidence. Mr. Houze was unlawfully detained at the primary inspection area of the Sarita immigration checkpoint. When Mr. Houze approached the checkpoint, law enforcement already had an unusual amount of information about him, none of which raised any concerns about immigration. Yet Border Patrol detained Mr. Houze for a significantly longer period of time than the preceding nine drivers, and longer than the amount of time reasonably necessary to complete the immigration-related purpose of the checkpoint stop. This violated the Fourth Amendment, and Mr. Houze's consent did not cure that violation since it was given during the unlawful detention.

Alternatively, Mr. Houze's continued detention at secondary was unconstitutional. As soon as he arrived at secondary, Mr. Houze fully revoked the consent he had given in primary. At that time, the agents had no basis to continue detaining Mr. Houze and therefore should have released him but did not. Nor does Mr. Houze's subsequent partial consent cure the Fourth Amendment violation since it was given during the unlawful detention.

For either of these reasons, the Court should reverse the district court's denial of Mr. Houze's motion to suppress, vacate Mr. Houze's conviction and sentence, and remand for further proceedings.

## ARGUMENT

**ISSUE RESTATED**: The district court reversibly erred by denying Mr. Houze's motion to suppress evidence.

### A. Standard of review.

In reviewing a district court's denial of a motion to suppress evidence, this Court "review[s] the factual findings of the district court for clear error and its legal conclusions *de novo* [and] view[s] the evidence in the light most favorable to the government as the prevailing party in the district court." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (citations omitted). The Court reviews *de novo* whether the "detention was unconstitutionally prolonged." *United States v. Conlenzo-Huffman*, 292 Fed. Appx. 361, 363 (5th Cir. 2008) (unpublished). "The government bears the burden of showing the reasonableness of a warrantless search or seizure." *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (citation omitted); *see also United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

### B. Legal framework.

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023). "Warrantless searches and seizures are per se unreasonable subject to certain narrow exceptions." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). One of those narrow exceptions approved by the Supreme Court is the government's warrantless, suspicionless seizure of a vehicle at a fixed interior immigration checkpoint "for brief questioning

of its occupants." *United States v. Martinez-Fuerte*, 428 U.S. 543, 545 (1976). These immigration-checkpoint stops should require only "a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Id.* at 558 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975)).

At a fixed checkpoint with "the primary purpose of identifying illegal immigrants, vehicles may be briefly detained ***in furtherance of that purpose*** and their occupants questioned, all without either a warrant or any individualized reasonable suspicion." *United States v. Jaime*, 473 F.3d 178, 181 (5th Cir. 2006) (emphasis added); *see also United States v. Machuca-Barrera*, 261 F.3d 425, 431 (5th Cir. 2001) (explaining that, although suspicionless "stops and questioning" are permitted at immigration checkpoints, "searches or 'further detention . . . must be based on consent or probable cause'") (quoting *Martinez-Fuerte*, 428 U.S. at 567).

During a suspicionless checkpoint stop, anything beyond the "brief question or two and possibly the production of a document evidencing a right to be in the United States" should be deemed unreasonable. *See Martinez-Fuerte*, 428 U.S. at 558, 566-67; *see also United States v. Portillo-Aguirre*, 311 F.3d 647, 652 (5th Cir. 2002) ("[A]ny further detention beyond a brief question or two or a request for documents evidencing a right to be in the United States must be based on consent or probable cause.") (citing *Martinez-Fuerte*, 428 U.S. at 558, 567). "[W]hen officers

detain travelers after the legitimate justification for a stop has ended, the continued detention is unreasonable." *Portillo-Aguirre*, 311 F.3d at 654.

By contrast to fixed immigration checkpoints, the Fourth Amendment forbids law enforcement officers from indiscriminately seizing persons by stopping them without individualized suspicion at checkpoints for general crime-control purposes, including drug interdiction. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37-38, 41-44 (2000). Instead, any seizure generally requires at least individualized reasonable suspicion of wrongdoing, which must be comprised of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also Edmond*, 531 U.S. at 37. The Supreme Court has carved out "limited exceptions" to permit suspicionless stops at checkpoints that are restricted to a specific programmatic purpose "closely related to the problems of policing the border or the necessity of ensuring roadway safety." *Edmond*, 531 U.S. at 41; *see also id.* at 38, 43; *Martinez-Fuerte*, 428 U.S. at 561-64.

In *Rodriguez v. United States*, the Supreme Court explained that the "tolerable duration" of a stop "is determined by the seizure's 'mission.'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "The scope of the detention must be carefully tailored to its underlying justification." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). A stop may "last no longer than is necessary to

effectuate [the stop's] purpose." *Id.* (citing *Royer*, 460 U.S. at 500; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the [stop] are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

"The reasonableness of a seizure . . . depends on what the police in fact do," and a law enforcement officer "always has to be reasonably diligent" in completing the stop's mission. *Id.* at 357. Diligence is gauged "by noting what the officer actually did and how he did it." *Id.* If a stop "exceed[s] the time needed to handle the matter for which the stop was made," the stop "violates the Constitution's shield against unreasonable seizures." *Id.* at 350. A stop's permissible duration "is limited to the time ***reasonably necessary*** to complete a brief investigation of the matter within the scope of the stop." *Machuca-Barrera*, 261 F.3d at 432-33 (emphasis added); *accord Portillo-Aguirre*, 311 F.3d at 655-56. "The permissible duration of an immigration checkpoint stop is therefore the time reasonably necessary to determine the citizenship status of the persons stopped. This would include the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention." *Machuca-Barrera*, 261 F.3d at 433.

### C. Mr. Houze's detention at the primary inspection area of the immigration checkpoint was unlawful.

Mr. Houze was unlawfully detained at the primary inspection area of the immigration checkpoint. Although drivers may ordinarily be detained at an immigration checkpoint without any individualized suspicion, this case was not ordinary. Law enforcement already had significant information about Mr. Houze and his Tiguan when he approached the checkpoint, based on their extensive surveillance operation in connection with a drug investigation. *See supra*, text at 4-10 (Agent Orzechowski's testimony). That investigation revealed information connecting Mr. Houze and the Tiguan to Michigan and San Antonio. ROA.141-143, 148, 151; ECF No. 75 at 3. The investigation did not raise any immigration-related suspicions.

From Agent Orzechowski and his BOLO, Border Patrol Agents DeLeon and Arroyo knew that Mr. Houze was suspected of participating in drug activity when he arrived at the primary inspection lane. ROA.153-154, 205, 210. And because of the BOLO, Agent DeLeon treated Mr. Houze differently than the preceding drivers. He did not ask Mr. Houze any questions related to immigration or citizenship. ECF No. 75 at 3; GX3 2:10 to 2:56; ROA.208. His interactions with the nine preceding drivers were very brief, and he detained Mr. Houze for a significantly longer period of time. *See* GX3. Yet Agent DeLeon had no immigration-related concerns with the Tiguan at all from the time he saw Mr. Houze to the time Mr. Houze went to

secondary. ROA.210. The only reason Mr. Houze was on Agent DeLeon's radar was the BOLO. ROA.210.

Law enforcement had an unusual amount of information about Mr. Houze when he approached the immigration checkpoint, but no immigration-related concerns. As a result, "the time reasonably necessary to complete," *Machuca-Barrera*, 261 F.3d at 432, the immigration-related purpose of the stop was essentially zero. Agent DeLeon's detention of Mr. Houze thus "exceed[ed] the time needed to handle the matter for which the stop was made," and therefore "violate[d] the Constitution's shield against unreasonable seizures." *Rodridguez*, 575 U.S. at 350. Put another way, the detention of Mr. Houze at the primary was not "in furtherance of" the checkpoint's purpose of "identifying illegal immigrants," *Jaime*, 473 F.3d at 181, since the agent had no immigration-related concerns and did not ask Mr. Houze any questions related to immigration status or citizenship. The purpose of detaining Mr. Houze was for the general crime-control purpose of drug interdiction, which is contrary to *Edmond* and thus unconstitutional. *See Edmond*, 531 U.S. at 37-38, 41-44.

This case is analogous to *Portillo-Aguirre*, where the Court held that a Border Patrol agent's prolonged detention of a bus passenger at an immigration checkpoint violated the Fourth Amendment. In *Portillo-Aguirre*, Agent Woodruff boarded a bus at the Sierra Blanca immigration checkpoint to conduct an immigration inspection

of all the passengers. *Id.* at 650. His *modus operandi* for bus inspections "was to verify the passengers' citizenship status and then begin looking for signs of narcotics trafficking," and he "proceeded in this manner on the day he arrested Portillo-Aguirre." *Id.* at 655. When he boarded the bus, he announced in English and Spanish that he "was performing an immigration inspection and asked non-United States citizens to have their documents ready." *Id.* at 650. He "inspected each passenger as he made his way down the aisle to the back of the bus." *Id.* Portillo-Aguirre was in the fourth row and "seemed nervous from the moment the agents boarded the bus," but his documents showing he was a resident alien satisfied Agent Woodruff that he was lawfully present in the United States. *Id.* Agent Woodruff completed his immigration inspection of all the other passengers and checked the bathroom at the back of the bus for illegal aliens or drugs. *Id.*

Agent Woodruff then returned to the front of the bus to exit and noticed a small carry-on bag under Portillo-Aguirre's seat. *Id.* The agent thought Portillo-Aguirre looked suspicious because he "appeared rigid and was looking straight ahead," and so he began to question Portillo-Aguirre about whether he had a bag on the bus, if the bag under his seat belonged to him, and what was in the bag. *Id.* Portillo-Aguirre "began to fidget nervously and replied that the bag contained books and clothes." *Id.* Agent Woodruff asked to look inside, and Portillo-Aguirre placed the bag in the aisle and opened it, attempting to show that it contained books and

clothes. *Id.* at 650-51. But Agent Woodruff thought something was concealed in the bottom of the bag and requested permission to search the bag, and Portillo-Aguirre consented. *Id.* at 651. Agent Woodruff found a bundle consistent with narcotics packaging and arrested Portillo-Aguirre. *Id.*

The Court held that Agent Woodruff's continued detention of Portillo-Aguirre, after he had completed his immigration inspection of all the bus passengers, violated the Fourth Amendment. *Id.* at 656. The Court recognized that the Supreme Court had "upheld brief, suspicionless seizures of motorists at checkpoints created to intercept illegal aliens," but that the Supreme Court had held that checkpoints for the primary purpose of intercepting illegal narcotics violate the Fourth Amendment. *Id.* at 655 (citing *Martinez-Fuerte*, 428 U.S. 543; *Edmond*, 531 U.S. at 47-48). While the Court did not doubt that the Sierra Blanca checkpoint had the lawful primary purpose of investigating immigration status, that did "not leave [the Court] free to ignore the unconstitutionality of suspicionless detentions designed to intercept drug traffickers." *Id.* The Court found that Agent Woodruff's conduct was "essentially an attempt to circumvent the Court's holding in *Edmond* by broadening the scope of an otherwise lawful immigration seizure to include drug interdiction activity." *Id.* "[W]hen the purpose of a stop switches from enforcement of immigration laws to drug interdiction, a Fourth Amendment violation occurs unless the Border Patrol agent has individualized suspicion of wrongdoing." *Id.* Agent Woodruff's stop of

Portillo-Aguirre "unquestionably exceeded [its] permissible duration," which was limited to "the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.* at 655-56. Since Agent Woodruff's immigration inspection did not "generate[] reasonable suspicion of criminal activity," he could not extend the stop to investigate drugs. *Id.* at 656.

Mr. Houze's case is similar to *Portillo-Aguirre*. Like Agent Woodruff, the agents' conduct in Mr. Houze's case amounted to an attempt to circumvent *Edmond* by using the immigration checkpoint to further a drug investigation. When Mr. Houze approached the checkpoint, law enforcement had essentially completed their immigration inspection through their extensive surveillance of and investigation into Mr. Houze and his Tiguan. Agent DeLeon never had any immigration-related concerns and never asked any questions related to immigration status or citizenship. ROA.210; ECF No. 75 at 3; GX3 2:10 to 2:56. Agent DeLeon's continued detention of Mr. Houze to further a drug investigation was thus unconstitutional because it "exceeded its permissible duration" of "the time reasonably necessary to determine the citizenship status of the persons stopped." *Portillo-Aguirre*, 311 F.3d at 655-56.

Nor did Agent DeLeon have reasonable suspicion to extend the stop based on a drug crime, especially since the K-9 at primary did not alert. ROA.265-266; *see United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) ("Once an officer's

suspicions have been . . . dispelled, the detention must end unless there is additional articulable, reasonable suspicion. At that point, continuation of the detention is no longer supported by the facts that justified its initiation.") (citation omitted). At most, law enforcement had just a hunch. *See, e.g.*, *United States v. Jackson*, 328 Fed. Appx. 933, 936-38 (5th Cir. 2009) (unpublished) (considering "the information supplied by the informants together with the fruits, or lack thereof, of the officer's surveillance" and holding that officers lacked reasonable suspicion to conduct investigatory stop of the defendant's vehicle when the officers' three-day surveillance "effort only undermined the informants' information").

The district court erred by treating this case as an ordinary checkpoint stop where the vehicle and its occupants are complete strangers to Border Patrol. *See* ECF No. 75 at 5-9. The court reasoned primarily that the Sarita checkpoint has been approved as a fixed immigration checkpoint for nearly 50 years. *See* ECF No. 75 at 8. But that analysis ignores the specific facts of this case, namely, the significant information that law enforcement already had about Mr. Houze when he arrived at the checkpoint. Although Border Patrol may generally detain people at checkpoints "in furtherance of" the checkpoint's purpose of "identifying illegal immigrants," *Jaime*, 473 F.3d at 181, that is not what happened here.

The district court's reliance on *United States v. Castille*, 478 Fed. Appx. 868 (5th Cir. 2012) (unpublished), was misplaced. *See* ECF No. 75 at 7 n.3. Unlike

Mr. Houze's case, *Castille* involved an ordinary checkpoint stop where the bus passenger was a complete stranger to the agent, and the agent needed to and did conduct an immigration inspection by asking the passenger whether he was a U.S. citizen. 478 Fed. App. at 869. So too did the district court err by relying on *Muehler v. Mena*, 544 U.S. 93 (2005). *See* ECF No. 75 at 9 n.4. The Supreme Court in that case recognized that a detention "prolonged by the questioning" can violate the Fourth Amendment. *See Mena*, 544 U.S. at 100-02. But the questioning in *Mena* did not violate the Fourth Amendment because the initial detention was lawful, and the Court of Appeals "did not find that the questioning extended the time Mena was detained." *See id.* at 101. In light of the information law enforcement had about Mr. Houze when he approached the checkpoint, his detention for questioning at primary extended the permissible length of the detention and was therefore unlawful.

Finally, the district court erred by disregarding all the information law enforcement learned during their drug investigation as the mere "subjective intentions of the agents." ECF No. 75 at 8. That conclusion is factually and legally incorrect. Factually, Mr. Houze's argument does not depend on Agent DeLeon's subjective motivations but rather his actions at the checkpoint when detaining Mr. Houze based on the BOLO about suspected drug activity. He treated Mr. Houze differently than other drivers due to that information, did not even ask about citizenship status, and prolonged the stop of Mr. Houze despite lacking any

immigration-related concerns. ROA.210; GX3. As the Supreme Court explained in *Rodriguez*, "[t]he reasonableness of a seizure . . . depends on what the police in fact do." 575 U.S. 348 at 357. An agent "always has to be reasonably diligent" in completing the stop's mission, and that diligence is gauged "by noting what the officer actually did and how he did it." *Id.* If, as in this case, the stop "exceed[s] the time needed to handle the matter for which the stop was made," then the stop "violates the Constitution's shield against unreasonable seizures." *Id.* at 350.

Legally, the district court's opinion "failed to heed [the Supreme Court's] clear direction that any assessment" as to whether police conduct violates the Fourth Amendment "must take into account 'all of the circumstances surrounding the incident' in each individual case." *Michigan v. Chesternut*, 486 U.S. 567, 572 (1988) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and that "standard takes into account the totality of the circumstances—the whole picture." *Kansas v. Glover*, 589 U.S. 376, 385-86 (2020) (citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014); *Navarette v. California*, 572 U.S. 393, 397 (2014)); *see also Machuca-Barrera*, 261 F.3d at 433 ("The Fourth Amendment's requirement that stops be reasonable applies equally to a checkpoint."). The totality of the circumstances in this case includes the information that law enforcement had learned about Mr. Houze during the course of their drug investigation, before he arrived at the checkpoint. In light of that

information indicating that Mr. Houze had ties to Michigan and the Tiguan was registered in San Antonio, Mr. Houze's prolonged detention at the primary area of the immigration checkpoint was unconstitutional.

### D. Mr. Houze's consent to search did not dissipate the taint of the Fourth Amendment violation.

While consent may dissipate the taint of a Fourth Amendment violation, "[t]he Government's burden to prove that the defendant [validly] consented . . . 'becomes all the more difficult' when there has been a prior constitutional violation." *Macias*, 658 F.3d at 522. In analyzing "consent given after an unconstitutional detention, a two-pronged inquiry is applied: (1) whether the consent was voluntarily and freely given; and (2) whether the consent was an independent act of free will." *Id.* The government bears the burden on both prongs. *See id.* at 523; *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (the government did not "meet its burden of proving that [the] consent was independently given").

Mr. Houze's consent to search was not an independent act of free will. "To determine whether consent was an independent act of free will and, thus, broke the causal chain between the consent and the illegal detention, [the Court is] guided by three factors: 1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *Macias*, 658 F.3d at 523 (cleaned up). Mr. Houze acquiesced to the officer's request for consent while he was being unlawfully detained at primary.

There were no intervening circumstances. *Compare and contrast United States v. Ansourian*, 487 Fed. Appx. 155, 158 (5th Cir. 2012) (unpublished) (finding that, even though the traffic stop was unconstitutionally extended after the license check was completed, the driver's "consent was an independent act of free will" when the officer told the driver "You're free to go" and had returned the driver's license and registration before asking for consent). And the misconduct was flagrant since there were never any immigration concerns and yet agents prolonged the stop of Mr. Houze at the immigration checkpoint in furtherance of a fishing expedition for drugs, in clear violation of *Edmond*. Thus, "even assuming that [Mr. Houze's] consent was voluntarily given . . . the consent was nevertheless not valid. Instead, the causal chain between the illegal detention and [Mr. Houze's] consent to [the agent] was not broken, and therefore the search was nonconsensual." *Macias*, 658 F.3d at 524; *see also Jenson*, 462 F.3d at 407 (same); *United States v. Martinez*, 486 F.3d 855, 865 (5th Cir. 2007) (holding that consent did not dissipate the taint of the illegal stop when "the causal link was unbroken" and the purpose of the illegal stop was to obtain consent to search); *United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) (holding that "the consent to search was not an independent act of free will, but rather a product of the unlawfully extended detention").

For these reasons, the district court erred in denying Mr. Houze's motion to suppress evidence. The Court should, therefore, reverse the district court's denial of

Mr. Houze's motion, vacate his conviction and sentence, and remand for further proceedings.

**E. Alternatively, Mr. Houze's continued detention in secondary after he revoked his consent was unlawful.**

Assuming *arguendo* that Mr. Houze's detention at primary was lawful, the Court should still reverse the district court's suppression ruling because the continued detention of Mr. Houze in secondary, after he revoked his consent, was unlawful.

As explained above, agents at an immigration checkpoint may not detain someone longer that the time reasonably necessary to complete the immigration-purpose of the stop, absent consent or reasonable suspicion of criminal activity. *See, e.g.*, *Rodriguez*, 575 U.S. at 354; *Machuca-Barrera*, 261 F.3d at 432; *Portillo-Aguirre*, 311 F.3d at 655-56. Here, the immigration inspection was completed in primary, and nothing at primary raised any suspicions: The K-9 did not alert, Agent DeLeon had no immigration-related concerns, and he found that Mr. Houze's demeanor was "cordial," "cooperative," and "[a]greeable," and he had "nothing bad to say." ROA.201, 210, 265-266.

Although Mr. Houze consented to a search in primary, he fully revoked that consent when he arrived at secondary, as the district court found. ECF No. 75 at 9; ECF No. 110 at 3; ROA.341. At that time, the agents should have released him. *See United States v. Dortch*, 199 F.3d 193, 199 (5th Cir. 1999), *opinion corrected on*

*denial of reh'g*, 203 F.3d 883 (5th Cir. 2000) (holding that, once the purpose of the traffic stop had been completed, "Dortch should have been free to leave in his car at that point. Once he was not permitted to drive away, the extended detention became an unreasonable seizure, because it was not supported by probable cause."); *United States v. Ho*, 94 F.3d 932, 934 (5th Cir. 1996) (holding that the officer's continued search of Ho's portfolio after Ho revoked his consent to search was unlawful because the officer lacked probable cause to arrest Ho, and the fruits of that unlawful search were therefore inadmissible). The agents' continued detention of Mr. Houze at secondary, after Mr. Houze revoked his consent and without reasonable suspicion, violated the Fourth Amendment. *See, e.g.*, *United States v. Brigham*, 382 F.3d 500, 510 (5th Cir. 2004) (*en banc*) (describing the Court's cases as holding that "after the computer checks came up 'clean,' there remained no reasonable suspicion of wrongdoing by the vehicle occupants. Continued questioning *thereafter* unconstitutionally prolonged the detentions").

While being unlawfully detained at secondary, Mr. Houze partially reinstated his consent. ROA.220; ECF No. 77 at 9-10. But that consent does not cure the taint of the Fourth Amendment violation because it was given during the unlawfully prolonged detention and was not an independent act of free will. *See, e.g.*, *Macias*, 658 F.3d at 523-24; *Jenson*, 462 F.3d at 407. Notably, the district court made a factual finding that, although Mr. Houze "was not under arrest," he was detained at

secondary "because he was not free to leave the checkpoint." ECF No. 75 at 11. When Mr. Houze revoked his consent, his continued detention at secondary became unlawful, and his partially reinstated consent during that unlawful detention without any intervening circumstances was not valid. *See, e.g.*, *Portillo-Aguirre*, 311 F.3d at 659 (finding the defendant's consent to be invalid when it was given after the agent illegally prolonged the defendant's detention at an immigration checkpoint, "no circumstances intervened between the detention and the consent, and there is no reason to think that [Portillo-Aguirre] believed he was free to go during that time"); *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000) (same when "there was a close temporal proximity between the illegal detention and [the defendant's] consent," "no circumstances intervened," and the clear "purpose of the detention was to obtain consent to search vehicles for narcotics"); *Dortch*, 199 F.3d at 202 (same when "the illegal conduct—the detention—continued until the officers had sought Dortch's consent to search his person a third time" and "no circumstances intervened between the detention and the consent, and there is no reason to think that Dortch believed he was free to go during that time").

Because Mr. Houze was unlawfully detained at secondary after he revoked his consent and without reasonable suspicion of criminal activity, the Court should reverse the district court's suppression ruling, vacate Mr. Houze's conviction and sentence, and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's denial of Mr. Houze's motion to suppress evidence, vacate his conviction and sentence, and remand for further proceedings.

Respectfully submitted,

PHILIP G. GALLAGHER
Federal Public Defender
Southern District of Texas

s/ Kathryn Shephard
KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

## CERTIFICATE OF SERVICE

All parties required to be served with copies of this document have been so served by filing via the Fifth Circuit ECF filing system.

s/ Kathryn Shephard
KATHRYN SHEPHARD

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,344 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 software (current version) in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3. This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because the brief has been redacted of any personal data identifiers.

4. This brief complies with the electronic submission of 5th Cir. R. 25.2.1 because this brief is an exact copy of the paper document.

5. This brief is free of viruses because the brief has been scanned for viruses with the most recent version of a commercial virus scanning program.

s/ Kathryn Shephard
KATHRYN SHEPHARD